# IN THE COURT OF APPEALS OF IOWA

No. 19-0722
Filed July 22, 2020

IN RE THE MARRIAGE OF SABET K. TEIA
AND SUHEIR E. KHALIL

Upon the Petition of
**SABET K. TEIA,**
     Petitioner-Appellant,

**And Concerning**
**SUHEIR E. KHALIL,**
     Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.

Husband appeals the spousal support award, the property division plan, and

the attorney fee obligation in this dissolution matter. **AFFIRMED AS MODIFIED.**

Jeremy L. Merrill of Lubinus Law Firm, PLLC, Des Moines, for appellant.

A. Zane Blessum and Susan R. Stockdale, Winterset, for appellee.

Considered by Bower, C.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

After the district court awarded Suheir Khalil spousal support and a property settlement, her husband, Sabet Teia, appealed asserting the awards were inequitable. We affirm the award as modified in this opinion and award Suheir appellate attorney fees.

### I. Background Facts and Proceedings.

Sabet was born in 1974 and Suheir in 1982. The parties married in June 2002 in Sudan. The couple immigrated to the United States in 2004 under refugee status. All of Sabet's high school education was in Sudan, and he attended a community college trucking program after immigrating to this country. Suheir's education ended with the completion of fifth grade in Sudan. She has no specialized training. Sabet filed for dissolution of the marriage in October 2017, when he moved out of the family home.[1] They bought the home on contract in 2012. Before the separation, Sabet paid the contract payment, the house insurance, the real estate taxes, and the utilities. When he left the home, he stopped all payments towards these obligations. Without the help Sabet provided, Suheir failed to make the contract payments and she was evicted from the home during the forfeiture process. The home reverted to the contract holders. Now both parties live in rental units.

With no home equity to divide, the main assets accumulated during the marriage are the semi-trucks bought for Sabet's over-the-road trucking job and the parties' personal vehicles. The district court awarded Sabet all of these work

---

[1] The parties have no children.

vehicles and three personal vehicles. The record is unclear about the history of all the vehicles but one semi-truck was bought after separation. And, after separation, Suheir bought a 2005 Lexus and currently makes payments of $180 per month toward that purchase. She received that vehicle along with the undisclosed debt.[2] Each party was awarded their personal possessions and any accounts held in his or her name in the dissolution order.

After a trial, the district court required Sabet to pay Suheir spousal support of $1000 per month for sixty months and a cash settlement of $8350 to equalize the disparity of assets between the parties. The court ordered Sabet to pay $6050 towards Suheir's attorney fees.

Sabet appeals. Suheir requests payment for her appellate attorney fees of $700.[3]

## II. Standard of Review.

A trial involving the dissolution of a marriage is an equitable proceeding. Iowa Code § 598.3 (2017). As a result, our review is de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012). While we give weight to the factual determinations made by the district court; its findings are not binding upon us. Iowa R. App. P. 6.904(3)(g).

When we review questions of spousal support, in our de novo review, we still "accord the trial court considerable latitude." *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005) (quoting *In re Marriage of Spiegel*, 553 N.W.2d 309,

---

[2] Suheir did not list this vehicle on her financial affidavit and testified she paid "7000 something" with a down payment of $3000.

[3] Appellate counsel filed a detailed affidavit of fees.

319 (Iowa 1996)); *see also  Schenkelberg*, 824 N.W.2d at 486.  And we will disturb the trial court's findings "only when there has been a failure to do equity."  *Olson*, 705 N.W.2d at 315 (quoting *Spiegel*, 553 N.W.2d at 319).

"Although our review is de novo, we will defer to the trial court when valuations are accompanied with supporting credibility findings or corroborating evidence."  *In re Marriage of Vieth*, 591 N.W.2d 639, 640 (Iowa Ct. App. 1999); *see also In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007).  "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence."  *Hansen*, 733 N.W.2d at 703.

### III.  Discussion.

Because Sabet challenges the economic provisions of the decree, we note that courts consider spousal support and property divisions together in evaluating their individual sufficiency.  *In re Marriage of Callenius*, 309 N.W.2d 510, 513–14 (Iowa 1981).  We do the same.

**A.  Spousal Support.**  Spousal support is a discretionary award dependent on each party's earning capacity and present standard of living, as well as the ability to pay and the relative need for support.  *See Olson*, 705 N.W.2d at 315–16.  "Spousal support 'is not an absolute right, and an award thereof depends upon the circumstances of a particular case.'"  *Schenkelberg*, 824 N.W.2d at 486 (citation omitted).  The factors listed in Iowa Code section 598.21A(1) guide our review of a request for spousal support and we:

> may grant an order requiring support payments . . . for a limited or indefinite length of time after considering all of the following:
> a.  The length of the marriage.
> b.  The age and physical and emotional health of the parties.

  c. The distribution of property made pursuant to section 598.21.

  d. The educational level of each party at the time of marriage and at the time the action is commenced.

  e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

  f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

  g. The tax consequences to each party.

  h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

  i. The provisions of an antenuptial agreement.

  j. Other factors the court may determine to be relevant in an individual case.

Plugging in the first statutory factor, we note this marriage lasted for approximately sixteen years. Next, neither person has health issues. Both are still in their income-producing years. While Suheir's educational level might be limiting, she maintains an income stream of over $20,000 per year. After community college, Sabet's gross trucking income over the years ranged from $95,260 to $198,683. The district court noted that Sabet's income allowed the couple to purchase a home and helped maintain the parties' married lifestyle. And while Suheir could have remained in the family home paying the $494 monthly payment instead of her $670 rental payment, when Sabet moved, he left and stopped paying the house-related expenses he had paid before separation. It was not lost on the court that because Sabet offered no help with the home expenses, no payments were made and the home contract was forfeited.

After noting Sabet's "remarkably larger" income, the district court ordered monthly spousal support payments of $1000 for five years to Suheir. In the analysis, the district court characterized the case as warranting elements of traditional and transitional spousal support. *See In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015) (noting "cases applying the statute have identified three kinds of support: traditional, rehabilitative, and reimbursement"); *In re Marriage of Smith*, 573 N.W.2d 924, 926–28 (Iowa 1998) (applying a three-year award of spousal support to offer short-term assistance in the transition from married to single status). And with her limited earnings, Suheir established the need for support. The question is Sabet's ability to pay.

That being said, the calculation of net income available to Sabet is our challenge. In his trucking venture, Sabet operates as an independent contractor with no benefits. He argues the district court failed to consider his net income and instead used his gross income to calculate spousal support. If calculated correctly, Sabet opines the disparity in their incomes is slight. *See In re Marriage of Geil*, 509 N.W.2d 738, 742 (Iowa 1993) (noting that in a marriage of long duration alimony is appropriate "especially where the disparity in earning capacity has been great").

The tax returns for 2012 through 2017[4] produced at trial detail Sabet's claimed expenses necessary to operate his truck. Sabet testified he pays all fuel expenses and deducts those from his earnings. But in examining other deductions, the district court determined that some expenses taken were

---

[4] Beginning in 2007, the parties filed their tax returns as married filing separately.

excessive and that there was "no adequate and reasonable explanation for these large amounts." For example, in some years, expenses claimed were for advertising ($9000), tools for the truck ($6000), a computer and printers ($4650) and other office expenses ($9000). No one explained the need for thousands of dollars for advertising when Sabet trucked for the same company. And although Sabet bought tools, he testified he only drove the truck and did not repair it. *See In re Marriage of McKamey*, 522 N.W.2d 95, 99 (Iowa Ct. App. 1994) (concluding that district court properly increased self-employed husband's income by amounts "taken from the business for personal use but claimed as expenses on [the husband's] tax returns"). That said, Sabet did make the case that requirements of the job required legitimate expenditures. He explained that he needed to wear heavy work clothes and maintain certain truck cleaning and hygiene for his work. Plus he appropriately deducted a per diem meal expense.

Both parties related confusing details about the trucking operation. Suheir maintained Sabet's two semi-trucks both operated and that he had a plan to run both of them as a part of his business but in later testimony agreed with Sabet that the older semi-truck was non-functional. To continue to confuse matters, no one could explain why in 2016 and 2017 Sabet filed two schedule C forms with his tax returns. Likewise, in Sabet's separate banking records, several large cash withdrawals occurred without explanation of where the money went and the purpose for the withdrawals.[5] And Suheir argued that even with the large

---

[5] Sabet argued he took cash from the business savings account to pay trucking expenses through his personal checking account, but he could not remember reasons for specific cash withdrawals.

deduction for fuel, Sabet netted $2356 every two weeks from the operation. Sabet countered that he still had other deductions, such as maintenance expenses. To arrive at an actual net income figure for Sabet, we are hamstrung by the lack of clarity in the record.[6]

So we turn to what evidence exists of trucking income and expenses as developed in this record. *See In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991) (stating we determine the parties' incomes based on "the most reliable evidence presented"). After reviewing the record and the tax returns provided, we determine that the business expenses for fuel represented the largest annual expense of the trucking business and that some other expenses were legitimate trucking deductions. *See In re Marriage of Gaer*, 476 N.W.2d 324, 327 (Iowa 1991) (addressing truck driver's net income by deducting business expenses and depreciation). We have applied the principles from the *Gaer* line of cases to alimony disputes. *See, e.g.*, *In re Marriage of Jenks*, No. 01-0018, 2002 WL 575574, at *2 (Iowa Ct. App. Mar. 13, 2002). But, the district court observed the parties and concluded that Sabet offered insufficient support for the legitimacy of some larger expenses. *See Gaer*, 476 N.W.2d at 329 (finding "that *some* consideration must be given to business expenses reasonably necessary to maintain the business or occupation"). We give deference to the "gut feeling" of the trial court who carries the advantage of listening to and observing the parties while making its credibility findings. *See McKee v. Dicus*, 785 N.W.2d 733, 738 (Iowa Ct. App. 2010) (noting trial judges often develop a "gut feeling" about the

---

[6] The district court commented on Sabet's gross earnings, but did not drill down to the net income considered in formulating the spousal support award.

result); *see also In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (emphasizing that "[t]here is good reason for [appellate courts] to pay very close attention to the trial court's assessment of the credibility of witnesses").

So other than the expense items called out by the trial court, we do the math to arrive at Sabet's net income. Here, once the fuel expense and the other regular annual business expenses are deducted,[7] Sabet's net income stream has been:

| Year | Gross | Net |
|------|-------|-----|
| 2012 | $139,302 | $47,970 |
| 2013 | $169,408 | $24,528 |
| 2014 | $198,683 | $42,930[8] |
| 2015 | $95,260 | $(5493)[9] |
| 2016 | $173,521 | $9108[10] |
| 2017 | $180,166 | $15,508[11] |

Then to arrive at a fair net income for Sabet, we average four years of net earnings (removing the highest income and lowest income years) and arrive at an average net income of $21,518.50. *See In re Marriage of Knickerbocker*, 601 N.W.2d 48, 52 (Iowa 1999) (finding it was reasonable for court to average four years of income for support calculation given the fluctuations in the husband's farm income).

As an hourly wage earner, Suheir's financial situation requires less analysis. Since 2008, Suheir has worked for a food service company at Drake University.

---

[7] We removed those expenses the district court noted as "unreasonably high," which were the advertising, tool, and office expenses.

[8] The net income shown for 2014 does not allow for expenses for tools ($6000) and office ($3000).

[9] The net income for 2015 does not allow for expenses for advertising ($5600) and office ($6750).

[10] The 2016 net income does not allow for expenses for advertising ($7600), tools ($1331), or office ($8488).

[11] The expenses for office ($9150) and advertising ($6200) are not deducted from the 2017 gross income.

During the nine months of the college school year, she works thirty-seven hours per work week. In the summer, the work slows and Suheir receives unemployment benefits. The company pays her $13.35 per hour with health insurance available to her. The district court found her gross income ranged from $17,000 to $20,273 per year. After a review of the financial affidavits, Suheir reported net income of $1489.16 and monthly expenses of $1758, but this amount did not include the rent expense of $670 or her $180 monthly car payment. Thus her corrected monthly expenses exceed $2600. The court must balance each party's relative needs against their earning capacity, present standards of living, and ability to pay. *In re Marriage of Williams*, 449 N.W.2d 878, 883 (Iowa Ct. App. 1989). "[T]he spouse with the lesser earning capacity is entitled to be supported, for a reasonable time, in a manner as closely resembling the standards existing during the marriage as possible." *In re Marriage of Hayne*, 334 N.W.2d 347, 351 (Iowa Ct. App. 1983). But the amount of spousal support awarded should not destroy the right of the party providing the support to also enjoy a comparable standard of living. *Id.* Sabet reported monthly expenses of $2311.

During the parties' marriage, both worked at manual labor jobs. With the benefit of additional education, Sabet improved his gross earning capability but has yet to realize a consistent net profit greatly exceeding Suheir's earning capacity in contrast to what the district court determined. With a fifth-grade education, Suheir is limited to her current earning capacity. Suheir is entitled to a spousal support award to assist in her transition from a married status to a single status so she can become self-supporting. And Sabet must be able to afford to pay. We find the spousal support award should be reduced to $500 per month for

a period of five years, noting the feasibility of Sabet controlling the expenses of his business in those earlier years where he recognized a more significant net profit from the trucking business.

**B. Property Award.** Iowa Code section 598.21(5) requires an equitable division of marital property in dissolution-of-marriage cases. *See also Hansen*, 733 N.W.2d at 702. This mandate requires that we first determine which property is subject to division, and then, after considering the section 598.21(5) factors, divide the property equitably. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007). "Valuation is difficult and trial courts are given considerable leeway in resolving disputes as to valuations." *In re Marriage of Shanks*, 805 N.W.2d 175, 177 (Iowa Ct. App. 2011). "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence." *Hansen*, 733 N.W.2d at 703. Even though our review is de novo, we generally "defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence." *Id.* Yet, because our review is de novo, we may make our own findings and conclusions on issues properly raised but not decided by the district court. *See Lessenger v. Lessenger*, 156 N.W.2d 845, 846 (Iowa 1968) (noting our review of an equity case is de novo where we may issue fact findings and legal conclusions on our own review as we deem proper). Stated another way, because our review is de novo, we need not determine the intent of the district court but conduct "our own review of the statutory factors relevant to an equitable distribution of marital property." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 683 (Iowa 2005).

At separation, Suheir and Sabet divided their personal assets. So the crux of Suheir's trial request centered on the amount of equalization payment due to her. In the financial affidavits, both parties provided values for most of the assets discussed at trial but not all. The parties also testified about asset values and debts. We note that the owner of the property "is a competent witness to testify to its market value." *Hansen*, 733 N.W.2d at 703. Yet we do not have benefit of reviewing the work product of the district court's distribution table showing a breakdown of asset values it used. With limited information available to the district court, it reasoned that a cash settlement payment of $8350 resolved the disparity in the assets awarded between the parties.[12]

Frankly, the parties accumulated few assets during this marriage. We observe that the bulk of assets were the work and personal vehicles. Sabet financed a used semi-truck in early January 2019. We glean from the record that considering the debt, the new semi-truck net worth was $9000. Sabet placed a value of $3000 on the other non-functioning semi-truck. Then on cross-examination, Suheir agreed to those values. No one provided official valuations for any of the vehicles and only referenced purchase prices from various years of vehicle purchases. So we, as with the district court, are left to address values with that limited record. In the decree, Sabet received the 2007 Freightliner semi-truck ($3000), the 2014 International semi-truck ($9000), the 2004 Chrysler Sebring ($2500), the 2003 Toyota Sequoia ($5000) and a 1998 F-150 pickup ($1000).[13]

---

[12] We have no information whether assets bought after the separation were in the analysis. So we include all assets referenced at trial in our calculations.

[13] These figures reflect net values for the most part but also reflect purchase prices of vehicles and values from the financial affidavits.

Suheir was awarded the 2005 Lexus ($3000).[14]  Neither party held any significant cash in accounts—Suheir disclosed $1500 in the bank and Sabet listed $150 in his accounts.

In his brief, Sabet criticizes the district court's property award of $8350, suggesting that the home equity should have been part of the property award to Suheir.  First, the home is no longer an asset of the parties because of the forfeiture.  Second, no one offered any evidence of the equity in the home, which Sabet concedes.  The district court did not consider the home in the calculations, and neither do we.  Without factoring in the home, we calculate Sabet's net asset award at $21,650 and Suheir's net asset award at $4500.  If we were only to consider the net value of these assets, an equal division would require a payment to Suheir of $8075, which is close to what the district court ordered.

Because Sabet noted a debt owed to the Internal Revenue Service (IRS) for taxes due in the years 2012 and 2013, we briefly address that liability.[15]  The debt originated during the marriage and before the marital strife.  If we assume, as the district court did, that the IRS debt is about $15,000, Suheir might have some responsibility for the repayment as she and Sabet benefitted from the income stream in 2012 and 2013 when they bought their home on contract.  As a marital

---

[14] This is also a net figure and represents the down payment made on the purchase from monies Suheir received from the Sudanese community fund.  Suheir contributes $250 per month to the fund and when her turn to benefit from the contributions arose, she received $3000.  She used it to purchase a $7000 Lexus and is making monthly payments on the loan for the remaining balance.

[15] The record was unclear and at trial Sabet suggested the total amount owed to the federal government was $17,557.  His financial affidavit showed $15,500 as the total delinquent tax obligation related to his 2012 and 2013 married, filing separate tax returns, his trial brief notes $15,000 and the trial court referenced a $15,000 tax debt attributable to Sabet.

unit, both had access to more cash because of the failure to pay the taxes. But Sabet acknowledged this debt involved the trucking business, he filed his own separate return during the years he failed to pay, and there was no evidence about Suheir's involvement in the failure to pay taxes. *See In re Marriage of Tripp*, No. 16-1996, 2017 WL 3067716, at *3 (Iowa Ct. App. July 19, 2017) (concluding obligation for back taxes related to a bar the couple owned was solely the husband's debt as he acknowledged it was his responsibility and there was no testimony that the wife was involved in the failure to pay); *In re Marriage of Smitley*, No. 02-1791, 2004 WL 433733, at *2 (Iowa Ct. App., Mar. 10, 2004) (finding the failure to pay taxes was attributable to the husband where he "was self-employed and controlled his own income tax reporting"). Thus, the IRS debt is not factored into the division of net marital assets.

Finding the equalization payment to be equitable, we affirm the district court's award.

**C. Attorney Fees.** The district court has the discretion to make an award of attorney fees when equitable. *In re Marriage of Rosenfeld*, 668 N.W.2d 840, 849 (Iowa 2003). Such was the case here when the district court awarded Suheir trial attorney fees. We will not disturb that award.

As for her request for appellate attorney fees, Sabet shall pay Suheir's appellate attorney fees of $700.

**IV. Conclusion.**

We affirm the district court dissolution order as modified.

**AFFIRMED AS MODIFIED.**